**John Michael DAVIS, Petitioner–Appellant,**

v.

**Walter D. ZANT, Warden, Georgia Diagnostic and Classification Center, Respondent–Appellee.**

No. 92–9245.

United States Court of Appeals, Eleventh Circuit.

Oct. 21, 1994.

Donald B. Verrilli, Jr., and Theresa A. Chmara, Jenner & Block, Washington, DC, for appellant.

Mary Beth Westmoreland, Senior Asst. Atty. Gen., Atlanta, GA, for appellee.

Before ANDERSON, DUBINA and BLACK, Circuit Judges.

ANDERSON, Circuit Judge:

John Michael Davis appeals the denial of his federal petition for habeas corpus pursuant to 28 U.S.C. § 2254. Davis was convicted by a jury of first degree murder and armed robbery in connection with the death by strangulation of Susan Marlene Isham; he pled guilty to theft arising from the same incident. He was sentenced to death for the murder, twenty years for the armed robbery and ten years for theft. Davis's trial was conducted in June 1985. However, Patricia Underwood, Davis's codefendant, has consistently maintained, since at least November 1984, that she committed the murder. Because we find that prosecutorial misconduct at trial violated Constitutional guarantees of due process, we reverse the decision of the district court and order that the writ be granted.

## I. FACTS AND PROCEEDINGS BELOW

A jury convicted Davis of murder and armed robbery on June 8, 1985. He was sentenced to death that same day. Davis appealed, and the Georgia Supreme Court affirmed the conviction and sentence. *Davis v. State*, 255 Ga. 598, 340 S.E.2d 869 (Ga. 1986), *cert. denied,* 479 U.S. 870, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986). Davis petitioned for postconviction relief in the Superior Court for Butts County, Georgia, in December 1986. Evidentiary hearings were conducted on October 21, 1988, and November 21, 1988. The petition was subsequently denied. Davis filed a certificate of probable cause to appeal, which was denied by the Georgia Supreme Court on February 21, 1990. The U.S. Supreme Court denied certiorari. *Davis v. Kemp*, 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176 (1990).

Davis then filed a petition for habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Middle District of Georgia. Davis also moved for the right to conduct discovery, for funds for depositions and expert assistance, for an evidentiary hearing, and to expand the record. The district court denied Davis's motions and eighteen months after the petition was filed, the district court denied the habeas petition in a one paragraph order. The court held that all of Davis's claims were unexhausted, procedurally defaulted, or meritless. There were no findings of fact or conclusions of law. This appeal followed.

First we detail the relevant facts. The record before us contains the evidence presented at trial, and in addition evidence presented in the state habeas proceedings. Davis confessed to the murder twice immediately after he and Underwood were arrested. His confession was admitted at trial through the testimony of a police officer that witnessed the confession. Gary Lofton and Wayne Kite were key prosecution witnesses who had interaction with Davis and Underwood immediately before the crime. Lofton testified at trial for the prosecution. He was a friend of the victim, a member of a musical band that played at the bar where the victim met Davis and Underwood, and was bartending at that bar the day Isham was murdered. Wayne Kite was working the front desk of the Nora Faye Motel when Isham was murdered there.

Prior to Davis's trial, Underwood made a detailed tape recorded confession in the presence of Davis and his attorneys.[1] Underwood also told her attorney, Richard Mobley, that she alone had murdered Isham, that she wished to dismiss him from her case, and that she wanted to speak to Davis's attorneys.[2] All extrinsic evidence of Underwood's confession was excluded from the trial, however, and she refused to testify at trial by invoking the Fifth Amendment. Five days after Davis's conviction Underwood pled

---

1. The tape recording itself is not contained in the record on appeal, although a transcript of the tape, and Underwood's affidavit reiterating the contents of the tape, are contained in the record before us. The tape recording, the transcript, and the affidavit were first submitted to the state court during the postconviction proceedings.

2. The state argues that Davis's attorneys met with Underwood without obtaining Mobley's consent. However, as set out above, Underwood had already confessed to Mobley and expressed her desire to dismiss him. More significantly, the record indicates that Davis's attorney obtained permission from Judge Land to visit Underwood and interview her.

guilty to the murder and received a life sentence plus twenty years. Davis testified at trial that he had confessed to the murder in order to protect Underwood and that Underwood had actually committed the murder.

The facts up to the day of the murder are essentially undisputed. In December of 1983, Davis and Patricia Underwood, a woman whom he had dated for one month, stole an automobile in Philadelphia. They discovered large quantities of methamphetamine (or "speed") in the car, along with paraphernalia familiar to Davis, used in manufacturing speed. Davis and Underwood determined that they had stolen the car of a drug dealer. Fearing reprisal, they stole the methamphetamine and the drug dealer's identification pieces, abandoned the car, stole another automobile, and drove to Georgia. Davis and Underwood traveled in the stolen vehicle to Ellijay, Georgia, where Underwood's parents lived. After a short stay in Ellijay the couple drove on to Columbus, where they rented a room at the Nora Faye Motel on December 30, 1983. During their travels, Davis and Underwood consumed much of the methamphetamine in a week-long binge.

Davis encountered members of a musical band, including Gary Lofton, who were playing at a bar called the Peachtree Pub located across the street from the Nora Faye motel. The band members invited Davis and Underwood to come to the bar that evening. Davis and Underwood went to the Peachtree Pub for the evening and drank heavily. Underwood left the bar alone, before Davis. At some point Davis left the Pub and wrecked the automobile which he and Underwood had been using.

The next day was December 31, 1983, and the parties' versions of events begin to diverge. It is undisputed that the next afternoon Davis returned to the Peachtree Pub where he met the victim, Susan Marlene Isham, at the bar. Later, Underwood came to the bar to join Davis. The undisputed facts reveal that Davis and Isham conversed at some length and that Isham accompanied Davis to the Nora Faye Motel in a Mercury Marquis belonging to Isham's father. Ap-

parently, Isham decided to purchase some of the remaining drugs from Davis. The evidence shows that Underwood came to the Peachtree Pub that same afternoon after Davis had arrived and left before Davis. The facts also indicate that Underwood spent little time at the Peachtree Pub with Davis.

There is some dispute over the interaction between Davis and Underwood at the Peachtree Pub. According to Davis and Underwood, Underwood became upset at the interaction between Isham and Davis. Underwood and Davis argued, and Underwood left the bar alone. Underwood claims that she was angry and returned to the motel room and began drinking. Lofton testified at trial that he witnessed no confrontation between Underwood and Davis, and that Underwood spent most of her time at the bar separated from Isham and Davis.

Underwood's confession states that Davis returned to the motel with Isham and let himself into the room using a spare key that he had obtained from the front desk. Wayne Kite testified, however, that he witnessed Davis, Isham and Underwood conversing in the doorway of their motel room moments after Davis and Isham drove up to the motel in the Mercury Marquis. Kite testified that Davis came to pick up the spare key a few minutes later, after he had gained entry into the room.

Davis and Underwood maintain that Isham accompanied Davis to the motel in her car in order to purchase drugs before leaving to visit a friend in Atlanta. The state does not dispute the purpose of Isham's visit. According to Davis and Underwood, Underwood and Isham began arguing as soon as Isham entered the room. Underwood states that she was jealous and angry over the attention Davis had given to Isham. Davis testified that he calmed Underwood down in order to consummate the drug transaction. Isham allegedly purchased marijuana and some powdered vitamins that Davis and Underwood had falsely represented was "speed." After taking the money from Isham, Davis then left the room to pay for more lodging at the motel.[3] It is undisputed

---

3. Davis states that he paid for two more nights at the motel when he went into the office. Wayne

that Davis spent at least five minutes in the office talking with Wayne Kite while he paid for the room. According to Underwood, she and Isham argued again after Davis left. Underwood states that she was furious at Isham for the attention she had elicited from Davis. Underwood states that Isham was watching television while she went into the bathroom, that she ripped the cord from her electric curling iron, crept up behind Isham and wrapped the cord around her neck and began choking her. The two fell to the floor. Underwood and Davis stated that Isham urinated on Underwood's boots as she died.

Moments later, according to the testimony of Davis and Underwood, Davis returned to find Underwood engaged in strangling Isham. Davis testified that he pushed Underwood off of Isham, checked Isham's pulse and discovered that she had no pulse. Davis assisted Underwood in dragging Isham's body into the bathroom. Underwood left her own soiled boots in the motel room and took Isham's. Underwood stated that no other items were taken from Isham, although Davis admitted at trial that he removed some items from Isham's body before they left. The two fled the Nora Faye Motel in the Mercury Marquis that Isham had been driving. They claim that Davis decided to claim responsibility for the crime so that Underwood could avoid the death penalty.

According to the prosecution, Davis strangled the victim after she entered the motel room, while Underwood stood by. Their version of the events in the motel room is based on Davis's post-arrest confessions. According to those confessions, Davis impulsively ripped the electric cord from the curling iron and strangled Isham in the midst of the drug transaction. The prosecution argued that Davis had picked up the key and paid for another night at the motel in an effort to prevent entry into the motel room in order to delay discovery of the body. The prosecu-

tion argued that based on the testimony of Lofton and Wayne Kite, there was no evidence to support the notion that a feud between Underwood and Isham preceded the murder, thus attempting to undercut the motive Davis presented for Underwood's alleged murder. Furthermore, the prosecution highlighted Davis's greater size and strength, as compared to Underwood, and his long criminal record to support the conclusion that Davis had strangled Isham.

Admitted at trial and part of the record is a photograph of the scene of the crime which shows the boots Underwood allegedly left in the motel room after the victim urinated upon them. There is no evidence that disputes that these boots belonged to Underwood. Apparently, no tests were undertaken to verify or discount the urination allegation. At oral argument the parties had no knowledge of what became of the boots; they were not admitted at trial. ·

Davis and Underwood returned North after stealing the Mercury Marquis. On January 11, 1984, Davis and Underwood were arrested in New Jersey. Davis confessed to local police that he had committed the murder. After being returned to Georgia, Davis confessed again to police that he had committed the murder.

Both Underwood and Davis were indicted for first degree murder, armed robbery and theft. The prosecution entered into plea negotiations with the defendants, and offered both a life sentence in exchange for a plea. Later, however, the prosecution decided to seek the death penalty against Davis. In late 1984, Underwood began to send postcards to Davis's attorney, Richard Hagler, stating that she wished to dismiss her court-appointed attorney, Richard Mobley, and that she wished to speak to Hagler about the case. Hagler attempted to contact Mobley regarding Underwood's request, and was unsuccessful. However, defense counsel did

Kite testified that Davis paid for one night at that time; motel records were inconclusive. Wayne Kite testified that Underwood had come into the motel office earlier that day and moved the couple from room seven of the motel to room one. Wayne Kite testified that Underwood paid his father, who was operating the front desk at that time, for a night's stay at this time. Wayne Kite

testified that Davis came in later and paid for an additional night. Kite's father, Harold Kite, who also testified at trial for the prosecution, disputed his son's testimony that Underwood had paid for the first additional night during her visit. Harold Kite was not present later in the afternoon when Davis visited the front desk.

confirm with Judge Land that Underwood had written to Judge Land to discharge Mobley, and did obtain Judge Land's approval of the interview with Underwood.

On November 1, 1984, Hagler, his assistant Hyles, and Davis spoke to Underwood at the jail. Underwood's attorney was not present at this meeting. During this meeting, Hagler made an audiotape of the interview. Underwood stated that she had murdered Isham and that Davis had confessed to the crimes in order to prevent Underwood from bearing the brunt of the prosecution.

After making this tape recording Davis's lawyers sought to compel the state to reinstate it's prior plea offer to Davis. A hearing was held December 17, 1984 on this issue. Underwood was called to testify at this hearing. The prosecutor had learned that Underwood had spoken to Hagler and knew the substance of their conversations. He attempted to question her regarding her attempts to assist Davis and informed the trial judge, Hon. E. Mullins Whisnant, that Underwood intended to testify that she had committed the murder. The court denied the motion to compel reinstatement of the plea offer, and the case proceeded to trial.

## II. DISCUSSION

Davis raises numerous claims in this appeal. First, he argues that errors in the district court's handling of the habeas petition preclude affirmance without an evidentiary hearing and factual and legal conclusions. Given our decision this claim is moot. Some of the other claims are meritless, including (1) the claim that Davis was denied constitutional rights because of the prosecution's failure to produce allegedly exculpatory fingerprint evidence, (2) the claim that the failure to guide the jury at sentencing violated Davis's constitutional rights, and (3) the claim that trial court errors rendered the proceedings fundamentally unfair. Davis raises other claims that we will not discuss, but about which we express no opinion. These are (1) Davis's claim that he was unconstitutionally denied funds for a mental health expert at trial and sentencing, (2) his claim of witness intimidation (coercing Underwood to remain silent or face the death penalty),[4] and (3) Davis's claims of ineffective assistance of counsel. This opinion will discuss only two of the issues, (1) the exclusion of the codefendant confession, and (2) prosecutorial misconduct. For the reasons indicated below, and because our disposition of the prosecutorial misconduct claim makes it unnecessary, we decline to resolve the merits of the codefendant confession claim.

### A. Exclusion of the Codefendant Confession

On May 31, 1985, a few days before Davis's trial was to begin, the prosecution made a motion in limine to exclude all evidence pertaining to out of court statements made by Underwood regarding the murder.[5] The trial court made the following statement regarding evidence of Underwood's confession to Hagler, "I don't believe that would be admissible unless you planned or unless you were to assure the Court that you planned to call her." Hagler did not divulge the defense's strategy at that time regarding Underwood. At trial, however, the defense called Underwood to testify, but she refused to testify by invoking the Fifth Amendment right against self-incrimination.

---

4. We also will not discuss, and express no opinion on, the instances of prosecutorial misconduct which Davis alleges but which we do not discuss or rely upon in this opinion.

5. This motion stated in relevant part:

Now comes the state of Georgia before trial in the above referenced case and moves the Court in limine for an order instructing the defendant to refrain absolutely from making any direct or indirect reference whatsoever in person, by counsel or through witnesses, to the evidence or testimony hereinafter described and shows the following:

3. The State furthermore shows this Court it has been made aware that Counsel for the defendant have talked to defendant Davis's codefendant, Patricia Underwood, without the knowledge or consent of her court appointed lawyer, Mr. Richard Mobley. The State has learned that evidence of the conversation will be attempted to be placed in evidence by the defendant. The State shows this honorable Court that this is hearsay and improper evidence from a person out of Court and therefore should be excluded.

**1544**

Davis took the stand himself, and in response to questioning regarding the retraction of his confession, Davis stated that one reason he had abandoned the effort to portray himself as the murderer was because Underwood had already confessed herself. The prosecutor objected and the court sustained the objection.

Davis argues that the exclusion of all evidence related to the codefendant's confession violated Davis's constitutional right to due process. He relies heavily on three cases, *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Wilkerson v. Turner*, 693 F.2d 121 (11th Cir.1982). The constitutional analysis focuses upon two criteria: whether the excluded testimony was highly relevant to a critical issue, and whether the excluded testimony exhibited adequate indicia of reliability.

The Supreme Court of Georgia rejected Davis's argument, concluding that Underwood's confession was not sufficiently reliable. *Davis v. State*, 340 S.E.2d at 877. The state spends little time arguing the merits of the exclusion; but rather argues that the issue is procedurally defaulted. Contrary to the state's argument, it is clear that the exclusion of the confession is not procedurally barred. The issue was raised before and during the trial and throughout the post-conviction proceedings. Moreover, the Supreme Court of Georgia addressed the merits of the federal claim, finding that the confession did not satisfy *Green*. *Id.* However, the state also argues that some of the evidence relied upon by Davis to buttress the reliability of Underwood's confession was not

presented until the state post-conviction proceedings, and that it is not appropriate for a federal habeas court to consider same. *See Keeney v. Tamayo–Reyes*, ⸺ U.S. ⸺, ⸺, 112 S.Ct. 1715, 1718, 118 L.Ed.2d 318 (1992).

In light of our disposition of this case on another ground, we decline to address the merits of this difficult issue. The issue necessarily involves the complicated question in this case of the precise scope of the evidence which appropriately should be considered by a federal habeas court in evaluating the reliability of Underwood's confession. That in turn would involve a series of equally difficult subissues, including whether each distinct piece of evidence was in fact subject to a procedural default, and if so, whether Davis could establish cause and prejudice or a miscarriage of justice to overcome the bar.[6] The determination of some of those subissues might also require further evidentiary development.

### B. *The Prosecutorial Misconduct Claim*

Davis contends that many specific instances of prosecutorial misconduct during the guilt phase of his trial rendered the trial Constitutionally unfair; he also argues that the misconduct taken as a whole rendered the trial unconstitutional. Several of the alleged instances of misconduct involve Underwood's confession and the heart of the defense's case—that Underwood and not Davis actually killed Isham by strangulation. We conclude that these instances of misconduct, taken together, rendered Davis's trial unconstitutionally unfair.[7]

---

**6.** It is clear that the fact of Underwood's confession was presented to the trial court, based on a December 17, 1984 pretrial hearing, the state's motion in limine to exclude the confession, and the trial itself. It is also clear that evidence was presented to the trial court indicating that Underwood's confession was voluntary; evidence was submitted that Underwood had initiated the interview with Hagler by writing several postcards. It is less clear whether evidence that Underwood had also confessed to her own attorney, Mobley, was presented to the trial court, although there is at least an inference to this effect in the transcript of the Dec. 17, 1984, hearing. It is clear that neither the tape recording itself, nor a transcript thereof, were presented to the trial court. However, that evidence,

along with the affidavit of Underwood and the affidavit of Mobley, was presented in the state post-conviction proceedings. Moreover, it is at least arguable that the state court's post-conviction order makes an implicit factfinding that it would have been futile for defense counsel to have proffered a tape recording itself or a transcript thereof.

**7.** Although Davis alleges a litany of instances of prosecutorial misconduct, our decision is based only on the particular ones discussed and relied upon in the text below. We express no opinion with respect to the other alleged instances. *See* n. 4, *supra.*

## 1. Procedural Bar

■ The record before us does not reflect a contemporaneous objection by Davis's counsel to any of the specific instances of prosecutorial misconduct mentioned below. Under Georgia law, failure to object at trial to prosecutorial misconduct has long constituted a waiver, or procedural default, of such claims later in the litigation. *See, e.g. Earnest v. State*, 262 Ga. 494, 422 S.E.2d 188 (1992), *Aycock v. State*, 188 Ga. 550, 4 S.E.2d 221 (1939). It is not clear whether the Georgia Supreme Court ruled on the merits or invoked a procedural bar with respect to the instances of prosecutorial misconduct mentioned below. However, we need not ascertain that because the state did not assert, either in the district court or in this appeal, a procedural bar against the specific instances of misconduct that inform our decision.[8]

■ In its answer to the petition in the district court, the state specifically denied that the prosecutor's actions rendered the trial fundamentally unfair, and then went on to invoke the procedural bar against specific paragraphs of Davis's petition pertaining to his misconduct claim. Thus, the state enumerated precisely the particular instances of alleged misconduct with respect to which the state is asserting a procedural bar. In addition, the state's briefs, both in the district court and in this court, do not assert the procedural bar against Davis's claims of prosecutorial misconduct, except in specific instances, none of which affect our holding. Therefore, the state has waived the procedural requirements for those claims with respect to which it did not assert a procedural

default. *See Harrison v. Jones*, 880 F.2d 1279, 1282 (11th Cir.1989); *Boykins v. Wainwright*, 737 F.2d 1539, 1545 (11th Cir.), cert. denied, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985).[9]

## 2. Standard of Review

■ This court set out the standard for constitutional claims of prosecutorial misconduct in closing argument in *Brooks v. Kemp*, 762 F.2d 1383, 1399–1403 (11th Cir.1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated*, 809 F.2d 700 (11th Cir.) (en banc), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987). We relied on the Supreme Court case *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974), which held that a prosecutor's argument violates the Constitution if it renders the defendant's trial "so fundamentally unfair as to deny him due process." Improper argument by a prosecutor reaches this threshold of fundamental unfairness if it is "so egregious as to create a reasonable probability that the outcome was changed." *Id.* at 1403. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Thus, the defendant must show a reasonable probability that, but for the prosecutor's statements, the result of the proceeding would have been different. *Brooks*, 762 F.2d at 1401–02.[10] We review Davis's prosecutorial misconduct claim under the *Brooks* standard, including

---

8. Because no procedural bar was asserted, see text below, we assume that counsel for the state, who have a reputation for competence, professionalism and candor, determined either that there was a contemporaneous objection or that the Georgia Supreme Court ruled on the merits.

9. Despite the state's waiver of the procedural bar, the defendant's failure to object will still be a factor in our analysis of the fairness of the trial. *Brooks v. Kemp*, 762 F.2d 1383, 1397, n. 19 (11th Cir.1985).

10. On direct review of a federal conviction, we review improper prosecutorial statements for which there were no objections at trial under the "plain error" standard. *See United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84

L.Ed.2d 1 (1985); Fed.R.Crim.P. 52(b). In Georgia, assertions of error raised for the first time on appeal are also reviewed under a "plain error" standard, which the Georgia Supreme Court has held to be identical to the federal standard. *See Lynd v. State*, 262 Ga. 58, 60, 414 S.E.2d 5, 8 (Ga.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 420, 121 L.Ed.2d 342 (1992). These standards, however, apply only on direct appeal. Federal habeas corpus review of a state trial is a collateral review; the standard of review must be narrower. Thus, the two-part standard articulated above is narrower than the plain error standard. Any case which abridges the fundamental fairness standard will automatically be plain error.

**1546**

the misstatements that preceded closing argument.[11]

■ In a constitutional claim based on prosecutorial argument we generally do not analyze whether a particular comment or action is unconstitutional, unless the conduct violates an expressly enumerated right. *See Donnelly v. DeChristoforo,* 416 U.S. at 643, 94 S.Ct. at 1871; *Brooks,* 762 F.2d at 1400. Instead, we determine whether a remark or a series of remarks, in the context of that trial, rendered the entire trial unfair. *Id.* Therefore, the essence of such a claim is that the prosecutor's conduct as a whole violated the Fourteenth Amendment due process right to a fair trial. Different factors have been utilized by various courts in order to decide whether or not the cumulative errors at trial could be said to have, in reasonable probability, changed the result at trial including: 1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; 2) whether they are isolated or extensive; 3) whether they were deliberately or accidentally placed before the jury; and 4) the strength of the competent proof to establish the guilt of the accused. *Id.* at 1402, *Walker v. Davis,* 840 F.2d 834, 838 (11th Cir.1988).

■ Although it is not the task of a habeas court to retry the defendant, the standard for reviewing prosecutorial misconduct requires a weighing of the nature and scope of the instances of misconduct against the evidence of guilt against the accused. *See, e.g. Brooks,* 762 F.2d at 1401. Clearly, where the evidence against the accused is very strong, in order to merit relief, prosecutorial misconduct would have to be even more egregious and pervasive than in cases where the evidence is less compelling, e.g. where the defendant has a viable defense.

3. *The Prosecutor's Remarks*

a. Misrepresentation during Davis's Testimony

■ First we will discuss the remarks of the prosecutor regarding Davis's attempt to bring to light Underwood's confession, which was mentioned in the above discussion. Davis took the stand as the last witness in his trial. On direct examination, defense counsel Hagler asked Davis why he was recanting his confessions if he had earlier intended to protect Underwood. Davis responded, "Number one, Patty stepped forward and confessed to this crime about three months ago which they won't allow the confession." As soon as Davis made this statement, the prosecutor stated, "Objection to that, Your Honor. That's not evidence. *That's not true* and it's not evidence." [emphasis added]. Thus, the prosecutor stated in front of the jury that it was not true that Underwood had confessed.

It is clear, however, from the pretrial proceedings that the prosecutor knew for a fact that Underwood had confessed to the crime. He stated as much himself at the December 1984 pretrial hearing.[12] The prosecutor also admitted at the state postconviction proceedings that he knew that Underwood had confessed to the crime. Furthermore, he testified at the state postconviction proceedings that he and his assistant had given much thought to the means by which the defense would attempt to introduce evidence of Un-

---

11. Although the *Brooks* case dealt exclusively with prosecutorial argument, we apply the *Brooks* standard to prosecutorial misconduct at other stages of trial. *See Walker v. Davis,* 840 F.2d 834, 838 (11th Cir.1988) (alleged prosecutorial violation of advocate-witness rule); *Johnson v. Wainwright,* 806 F.2d 1479, 1486 (11th Cir.), *cert. denied,* 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987) (alleged misconduct in cross-examination). Thus, we examine improper comments made during the trial, as well as improper comments in closing argument, to determine whether they rendered the trial fundamentally unfair.

12. At the December 17, 1984 hearing, the prosecutor made the following statement to the court:

Also, Your Honor, what they've done, we would submit that this is important because it would show that what we expect to prove or believe to prove happened is that down at the jail a change was made in the way in statements [sic] that the defendants had formerly given. We expect to show that this defendant is going to try to testify that she did the killing to try to get him off the hook and try to get a life sentence for him and a life sentence for herself.

derwood's confession.[13] Thus, although the prosecutor's hearsay objection was entirely appropriate, his statement was false when, in addition to his objection, he said that Underwood had not confessed.

#### b. Misstatements in Closing Argument.

Below we set out the portions of the prosecutor's closing argument that we find improper.

##### i. First Argument

First the prosecutor portrayed Davis's defense that Underwood killed Isham as a last minute fabrication. As noted above, this misrepresented the facts known by the prosecutor at least as early as December, 1984, approximately six months before the trial.[14]

> Now ladies and gentlemen, let's consider old Jack Davis, alias John Marks alias George Sambucca alias Thomas Foster right here. Has he got any reason to get up here and swear to you something that isn't true. Has he got any reason in the world? He's got more reason than anyone I'm presently acquainted with. *This defendant if he gets one of you or twelve of you to believe in this hogwash that he's got up on that witness stand and told for the first time in living memory to anybody he's got a chance of getting out of here.* He's got a chance of riding down that elevator with you all and Mr. James Isham and going back to Philadelphia and being a street hustler again.

##### ii. Second Argument

The prosecutor again brought up the theme that the defense was a last minute fabrication while reminding the jury of Davis's prior confessions:

> Detective Oscar Jones said that everything that was in that statement is exactly what the man said. Nothing in there about Patty did it or I'm trying to save Patty or I'm just doing this because I can get a deal down there in Georgia or any of that kind of hogwash. *That is last minute stuff that*

> *they have come up with to try to save him from even a life sentence in this case because they're not asking you anything other than to turn him loose.*

##### iii. Third Argument

Next the prosecutor made his most disparaging and egregious comments with a rambling and highly improper commentary on the defense management of the trial. The centerpiece of the argument was the misrepresentation that the case of the defense—i.e., that Underwood and not Davis had actually killed Isham—was "thought up" during trial, after the prosecution closed its case. The prosecutor said this, all the while knowing that Underwood had confessed to the crime months earlier.

> Now ladies and gentlemen, when you think about this defendant and you think about his defense and you think about what you've heard in this case wasn't it rather amazing to you that after I got up in my opening statement and I talked about him and I came over here and I purposely got in his face, I got in his face and I told you what we were going to prove about him that he had come sown here and done this and done that and taken Susan Marlene Isham over there and strangled the life out of her, his lawyer did not even get up and utter one peep in defense of those charges. No. They said they were going to reserve their opening statement. And I noticed some of you folks on the jury looked, you looked astounded by that. You looked, you said, I could see you thinking, you mean they're going to let him, he's going to let that short fat guy call his client that and not even say anything? ...

> When you're a defense lawyer and you've got a man that is guilty and you've got to get him off and you ain't got the truth on your side and you're doing the best you can sometimes the best policy is

---

**13.** The prosecutor testified at the state habeas proceeding that "I remember at the trial, Mr. Pullen [co-prosecutor] and I was sitting back and wondering how they'd try to get it in...." Transcript of State Postconviction Proceedings Held on November 21, 1988 at 115.

**14.** In the quotations below, of course, all instances of emphasis have been added.

to wait and see what the State has and see if there are any weak spots in it. And then being a good lawyer you find a weak spot and you shoot a hole. You start aiming for that and maybe you can hustle the jury into believing something that ain't quite true but it might get him off which is the paramount thing here of course. So that is what Mr. Hagler did. *He didn't get up and tell you anything about Patty doing this, Patty doing that and about Gary Lofton lying.* He didn't ask Gary Lofton any questions about what he said Gary Lofton did, like about weren't you going to deal dope from this man over here. Did we hear any questions like that? No. *Why not? They hadn't thought them up yet. They hadn't decided where the weak spot was. . . .*

I submit to you that there was a good possibility of a mistaken identification issue being the defense in this case but when they heard the witnesses and they heard the testimony they decided that old Jack was just too distinctive and everybody could identify him over here so they were going to have to put him down here in Georgia. What is next? Well, we got him going to the room with some pretty good iron clad witnesses. *The only thing left is we're going to have to make the girl do it and that's the one they use.*

### iv. Fourth and Fifth Arguments

Finally, the prosecutor offered two more comments reinforcing his theme that the idea that Underwood had perpetrated the crime was fabricated by the defense at the last minute. First Conger stated, "[h]e is guilty because everything he has said in this courtroom yesterday made him guilty except his statement given for the first time that Patty Underwood did it." Near the end of his closing Conger added one final comment, opining, "I don't think you're going to buy this first time defense yesterday that we heard." .

### 4. Whether the Improper Remarks Denied Davis a Fair Trial

 *Brooks* and its progeny indicate that a court should first determine whether the remarks were in fact improper, and only then turn to the issue of whether fundamental fairness was denied. In this case, however, the impropriety lies in the prosecutor's use of misstatements and falsehoods. Little time and no discussion is necessary to conclude that it is improper for a prosecutor to use misstatements and falsehoods.[15]

Thus, we turn without delay to the issue of whether the prosecutor's misstatements rendered the trial fundamentally unfair. Before applying the law to the facts, some further elaboration of the impropriety is appropriate. As noted, when the prosecutor objected to Davis's testimony that Underwood had in fact confessed, the prosecutor stated in front of the jury not only his proper hearsay objection, but also the misstatement that Davis's testimony was not true. Had this miscue stood alone, we would hardly have faulted the prosecutor, and surely would not find error of constitutional magnitude. Such a misstatement could understandably slip out in spontaneous response to Davis's improper insertion into the trial of the fact of Underwood's confession. However, the spontaneity and innocence of this first misstatement is

---

**15.** We have noted before that prosecutors have a special duty of integrity in their arguments. *See Brooks,* 762 F.2d at 1399–1400. It is a fundamental tenet of the law that attorneys may not make material misstatements of fact in summation. *See, e.g., U.S. v. Teffera,* 985 F.2d 1082, 1089 n. 6 (D.C.Cir.1993) (prosecutor's repeated references in closing argument to alleged eye contact between codefendants at time of arrest, not supported by evidence, clearly improper and would merit reversal despite any curative instructions, because "phantom evidence" was a key part of closing argument).

Moreover, Georgia law, although it gives wide latitude to prosecutors in their jury arguments, see, e.g., *Brooks,* 762 F.2d at 1399, recognizes the duty of the prosecutor is "alone to subserve public justice." *Scott v. State,* 53 Ga.App. 61, 185 S.E. 131 (1936), *affirmed,* 184 Ga. 164, 190 S.E. 582 (1937). Furthermore, Georgia statutory law proscribes the very conduct at issue in this case. Ga.Stat. § 15–19–4 states, in relevant part:

It is the duty of attorneys at law:

(1) To maintain the respect due to courts of justice and judicial officers; .

(2) To employ, for the purpose of maintaining the causes conceded to them, such means only as are consistent with truth and never seek to mislead the judges or juries by any artifice or false statement of the law.

cast in doubt by the prosecutor's closing argument which contained repeated and clearly intentional misrepresentations of a similar nature.

A major theme of the prosecutor's closing argument was that the defense had, as a last minute fabrication, invented the theory that Underwood actually committed the murder. On at least five separate occasions during closing, the prosecutor made such statements which were either patently false or misleading with respect to this central defense. These misstatements portrayed the core of the defense case as an afterthought fabricated during trial after the state closed its evidence. The statements were not only clearly false, but the record in this case establishes beyond doubt that the misrepresentations were intentional and known to the prosecutor to be false. The prosecutor knew at least as early as the December 1984 pretrial hearing that Underwood had confessed, and he told the trial judge at that time that this would be Davis's defense. Moreover, the prosecutor admitted at the state post-conviction hearings not only that he had known about Underwood's confession but also that he had been concerned as to how Davis and his attorneys would go about mounting this defense.

Thus, when the prosecutor spun out before the jury his extended argument that the crux of the defense case had been "thought up" at the last minute after the prosecution closed its evidence, the prosecutor was attempting to subject the jury to the influence of clearly false information, and information clearly known to the prosecutor at the time to have been false. The prosecutor knew approximately six months before the trial that this was the likely defense. The other arguments, quoted above in full—all reinforcing the prosecutor's false theme that the crucial defense in the case was a "last minute," "first time in living memory," "first time defense"—were dispersed throughout the prosecutor's closing argument.

██ Thus, the prosecutor intentionally painted for the jury a distorted picture of the realities of this case in order to secure a conviction. Underwood's confession and the prospect that she actually committed the killing loomed over this trial. The prosecutor properly asserted a legal challenge to the admissibility of the confession, and was successful in excluding it. A prosecutor may argue his case with vigor. However, a prosecutor may not make intentional misrepresentations to the jury.[16]

██ We now undertake an evaluation of whether the foregoing improper remarks, considered in the context of the entire trial, rendered the trial unfair. As noted earlier, in determining whether there is a reasonable probability that prosecutorial misconduct changed the result of the trial, relevant criteria include (1) the degree to which the challenged remarks have a tendency to mislead the jury and. to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused. *Brooks,* 762 F.2d at 1402; *Walker,* 840 F.2d at 838.

First, it is clear that the challenged remarks were extremely misleading to the jury and prejudicial to the accused. As noted above, this record leaves no doubt that the prosecutor's statements were in fact false and misleading to the jury. The prejudice to the accused is equally clear. Although of course the confession of Underwood was not in evidence, the defense that Underwood had actually killed Isham was squarely placed before the jury in the testimony of Davis. Thus, the prosecutor's misrepresentations were intended to induce the jury to discredit Davis's testimony that Underwood had in fact killed Isham by strangulation. The prejudicial effect in this case is enhanced because the prosecutor's misrepresentations were designed to undermine the core of the de-

---

**16.** We note in passing that the prosecutor's misrepresentations took improper advantage of the exclusion of Underwood's confession and of the unavailability of Underwood's testimony by virtue of her invocation of the Fifth Amendment.

Of course, the prosecution was entirely within its rights to challenge the admissibility of Underwood's confession. However, the prosecutor exceeded the bounds of propriety when it sought to convey to the jury inconsistent false information.

fense.[17] The misrepresentations were calculated to undermine the credibility of Davis, and the whole defense hinged upon the jury's credibility determination, i.e., whether they believed Davis's eyewitness testimony, or whether they believed the contrary inferences arising from the state's circumstantial evidence.[18] Thus, we conclude that the prosecutor's statements were highly misleading and highly prejudicial.

Second, the extensive nature of the misconduct weighs in favor of Davis. During Davis's testimony, the prosecutor laid the groundwork for his assault on the defense and the defendant by making the false statement discussed above regarding the fact of Underwood's confession. Next, the prosecutor's closing argument hammered home to the jury the misrepresentation that the Underwood-as-perpetrator defense was a last minute defense conceived and fabricated during the course of the trial. The false statements were not isolated comments; they were part and parcel of a concentrated use of misrepresentation clearly aimed at discrediting the core of the defense. The repetitive nature of the comments distinguishes the instant case from those such as *Donnelly*, where the "impropriety was but one moment in an extended trial and was followed by specific disapproving instructions." 416 U.S. at 643, 94 S.Ct. at 1972.

Third, we noted above that the prosecutor's misrepresentations were deliberately placed before the jury. In this particular case, the clearly intentional nature of the misrepresentations weighs heavily in favor of Davis; such a patently dishonest argument brings this case close to the more traditionally established forms of misconduct such as the proscription against a prosecutor's knowing use of false testimony. See *e.g.*, *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brown v. Wainwright*, 785 F.2d 1457, 1464 (11th Cir.1986), or the

knowing use of false evidence, *See, Brooks*, 762 F.2d at 1402, n. 26 ("... [T]here may be cases where the prosecutor's intentional conduct rises to a level equivalent to a knowing use of false evidence.")

Finally we review the strength of the proof against Davis. After a careful review of the trial record, it is clear that the evidence against Davis was not strong enough to overbalance the prosecutorial misconduct in this case. We conclude that there is a reasonable probability that the jury would have come to a different conclusion but for the aforementioned misconduct. The evidence at trial and in the record before us overwhelmingly shows that either Davis, Underwood or both committed this crime. However, the evidence is inconclusive as to what actually happened in the motel room and who actually killed Isham. The only direct evidence bearing on that is Davis's trial testimony that Underwood killed Isham while he was at the motel office, and Davis's two prior inconsistent statements to police post-arrest. The facts before the jury simply do not confirm or foreclose either version of the events.

The state relied heavily on Davis's confessions and an inference that Davis was the stronger of the two and thus was far more capable of strangling the victim. The state's expert, however, did not deny that Underwood could have committed the murder. Moreover, the state had no fingerprint evidence linking Davis to the curling iron or the cord that was ripped from it and used to strangle the victim.

Furthermore, neither party knows the whereabouts of the boots that Underwood claims she left in the motel room after the victim urinated upon them during the struggle. A photograph introduced at trial clearly shows such a pair of boots in the motel room. The state admitted numerous pieces of clothing found in the vehicle stolen from the victim, but they did not admit these boots. The defense highlighted the boots, and their

---

**17.** In *United States v. Harp*, 536 F.2d 601, 603 (5th Cir.1976), *cert. denied*, 423 U.S. 934, 96 S.Ct. 289, 46 L.Ed.2d 265 (1975), the former Fifth Circuit held that a prosecutor's comment during closing argument regarding defendant's post-arrest silence would not be harmless error because it struck at the jugular of the defense. This illustrates that prosecutorial misconduct is

least acceptable under the Constitution when aimed the core of the defense's case.

**18.** The prosecutor's own closing argument acknowledged that the outcome of the case depended upon whether or not the jury believed Davis's testimony that Underwood had actually killed Isham.

absence from the record, in its jury argument, as did the defendant in his testimony. Obviously, if the boots had been tested and had revealed the presence of Isham's urine, that would have been strong evidence corroborating Davis's testimony that Underwood had killed Isham by strangulation and that Isham urinated on Underwood's boots during the struggle.

The evidence at trial indicated that Davis was away from the room—i.e. in the motel office—long enough for Underwood to have committed the murder. Nothing in the record suggests that Underwood was incapable of the killing. Indeed, Underwood pled guilty to a murder charge herself. Thus, the defense had a viable case that Davis was not the actual perpetrator of this crime, despite the exclusion of Underwood's confession.

The uncertainty of the evidence in this case distinguishes it from several other cases where prosecutorial misconduct was found to exist but did not render the trial fundamentally unfair. For example, in *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986), the Supreme Court found lamentable prosecutorial argument, but found that the misconduct did not render the trial fundamentally unfair. The court based its decision on several factors, including the fact that the weight of the evidence against the petitioner was so heavy that there was little likelihood that the prosecutor's argument influenced the jury's decision. *Id.* at 181, 106 S.Ct. at 2472.[19] In the instant case, the evidence at trial was much closer.

The defense counsel's closing argument failed to ameliorate the damage done to the defense by the prosecutor's misstatements.

Defense counsel Hagler made a vigorous argument based on the evidence admitted at the trial. Nevertheless, it is very unlikely that this closing argument eliminated the taint placed on the defense by the prosecution's misrepresentations. Hagler was able to counter the prosecutor's closing by relying on the evidence of the boots and pointing out inconsistencies in some of the state's evidence. He attempted to overcome the prosecutor's assault on his trial tactics by asserting that he had a right to reserve his argument. Nevertheless, aside from the boots, he was unsuccessful in countering the notion planted by the prosecutor that the defense was a last minute fabrication.

After a careful consideration of this record,[20] and in light of all the circumstances— including *inter alia* the fact that the misconduct consisted of intentional misrepresentations which were both highly misleading to the jury and prejudicial to Davis, the fact that the misrepresentations were calculated to undermine the crux of the defense, the fact that the misconduct was pervasive and the fact that there was a substantial conflict in the relevant evidence—we conclude that the prosecutorial misconduct in this case rendered the trial fundamentally unfair.

## III. CONCLUSION

Accordingly, the judgment of the district court is reversed and the case is remanded with directions to grant the writ of habeas corpus.

REVERSED.

**19.** Neither does the misconduct in the instant case fall within the "invited response" doctrine on which the *Darden* court relied as another reason that the misconduct at issue did not render the trial unfair. 477 U.S. at 182, 106 S.Ct. at 2472.

**20.** We noted above that counsel for Davis made no contemporaneous objection, but that the state in this case has waived any procedural bar. Nevertheless, failure to object is properly weighed in the overall evaluation of fundamental fairness. The failure to object can sometimes serve to clarify an ambiguous record as to whether a particular argument was in fact misleading or prejudicial. In this case, however, the statements above discussed were clearly false and were clearly highly prejudicial. Defense counsel's spontaneous reaction at this late stage of the case might have been not to call further attention to the false statements and hope to counter the argument in his own rebuttal. Hagler did make several attempts in his rebuttal to counter the prosecutor's misstatements; however, our examination of Hagler's rebuttal argument persuades us that he was utterly unsuccessful in countering the highly prejudicial misrepresentations by the prosecution. Under all the circumstances of this case, we conclude that the prosecutorial misconduct rendered the trial fundamentally unfair.