[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10437

_____

D.C. Docket No. 1:13-cr-00143-CG-C-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALFRED OMEGA FOSTER,
a.k.a. Alpha Omega Foster,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(September 11, 2015)

Before ED CARNES, Chief Judge, JILL PRYOR and BLACK, Circuit Judges.

ED CARNES, Chief Judge:

After a trial lasting less than seven hours from start to finish, a jury convicted Alfred Foster of one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g).  He contends that the district court committed plain error, and the government engaged in plain misconduct, when Assistant United States Attorney Gina Vann commented extensively, repeatedly, and improperly on his valid invocation of his Fifth Amendment privilege against self-incrimination.  He asserts other government misconduct, including the AUSA's remark during closing argument that "when [Foster] testified he said:  'I traded meth for sex with a white female.'"  As Foster argues, that remark was improper because:  he had not given that testimony; it violated the court's earlier ruling that evidence of Foster trading meth for sex was irrelevant and inadmissible; and it unnecessarily injected race and sex into the case.

## I.

Given the position of the parties and the undisputed evidence, the only contested element of the charged offense was whether Foster intended to exercise dominion and control over, and thereby constructively possess, a shotgun and a rifle seized by law enforcement from a bedroom Foster occupied in a house owned by a friend of his who also lived there.  There was no fingerprint or DNA evidence that Foster had ever touched either firearm.  The government attempted to prove that he intended to constructively possess them by establishing that they were

located next to several methamphetamine labs, that Foster admitted to officers that he had distributed meth, and that firearms are common tools of the drug trade.

In her opening argument, the AUSA told the jury that the evidence would show that Foster told law enforcement that he "ma[d]e and s[old] meth to make money, and sometimes [he] trade[d] meth for sex."[1]  Deputy John Cassady testified for the government about his interview of Foster on the day that the firearms were seized:

| AUSA: | . . . [W]hat did the defendant tell you? |
|---|---|
| CASSADY: | He advised that he was a convicted felon.  He then advised he had been cooking methamphetamine since November 2012, but he advised he only cooked three successful batches of methamphetamine.  He advised that he first shared the batch, the successful batch, with a white female named Sadie, and the second and third batches he advised were unsuccessful cooks.  He said the reason they were bad was because they were gooey.  He then later told me that he cooked some meth because he trades it for sexual favors. |
| DEFENSE: | Judge, we object again[2] to the relevancy of this. |
| THE COURT: | All right.  I sustain the objection to that portion of the interview. |

---

[1] This statement was made during opening argument without objection.  The court later ruled that evidence that Foster had traded meth for sex was irrelevant and inadmissible.

[2] Foster had filed a pretrial motion in limine arguing that evidence of meth and meth paraphernalia, which was found throughout the house where he lived with his friend, was not relevant to a firearms charge.  The court denied the motion as to the meth and meth paraphernalia found in the bedroom Foster occupied.  He does not challenge that ruling.

AUSA:            Well, may we approach, Your Honor?

THE COURT:      Yes.

(At the side bar, jury not present.)

AUSA:            Your Honor, I believe what the witness testified about was the distribution of meth, and it is our position that he is a drug dealer and drug dealers have guns as tools of the drug trade. We have to establish that he was distributing meth, and whether he traded it —

THE COURT:      I don't have any problem with you establishing that he was distributing it. But the fact that he was trading it for sexual favors —

DEFENSE:        Yeah.

THE COURT:      — you can just — I think you can fashion your question so that you don't have to get into that kind of details about it.

. . . .

(In open court, defendant and jury present.)

AUSA:            Okay.   Officer, I guess what I should ask you, a better way, is did the defendant admit that he was distributing or giving the drugs, the meth, to other people?

CASSADY:        Yes, ma'am.

Foster's defense depended on the jury crediting his testimony that he had no intent to possess the firearms found in the bedroom he was occupying in his friend's home. He testified that while he did have two drug-related convictions

4

and another conviction for receiving stolen property, he had never been convicted of an offense involving a firearm and he "d[id]n't particularly care for them." Regarding the two firearms in question, Foster testified that he had no knowledge of the one found in the closet of the bedroom because he did not use that closet and he believed the one hanging on the wall of the bedroom belonged to his friend.

On cross-examination, the AUSA attacked Foster's credibility, as she was entitled to do. In response to a question about whether he was distributing methamphetamine from his friend's house, Foster invoked his Fifth Amendment privilege against self-incrimination. The court ruled that the invocation was valid and Foster would not be required to answer the question. The court then told the AUSA that she could "ask him as many questions as [she] want[ed] and him claim the Fifth if he want[ed] to." But she went beyond that and asked argumentative questions designed to show that Foster was invoking his constitutional rights because he was guilty of a crime or crimes:

| AUSA: | When you say you take the Fifth, that means you don't want to answer that question because it'll get you in trouble? |
|---|---|
| FOSTER: | It means that I'm exercising my Fifth Amendment rights. |
| AUSA: | And your Fifth Amendment means you don't have to answer the question because it'll get you in trouble; right? Yes or no? |
| FOSTER: | The Fifth Amendment — |

5

AUSA:                 Yes or no, sir?  That's a yes or no question.

FOSTER:               You would be more familiar with it than I am.

DEFENSE:              Judge, she's asking him to draw a legal conclusion.

AUSA [to court]:      I'm asking him to tell the jury why he says that he's taking the Fifth.

AUSA [to Foster]:     Yes or no?

FOSTER:               Because the question that you asked involves a case that is still pending in the grand jury in the state of Alabama.

AUSA:                 And any answer truthfully could hurt you?

FOSTER:               I have the right against self-incrimination.

AUSA:                 Absolutely, sir.  And the reason you're taking that right is because the answer would incriminate you; right?

FOSTER:               Again —

AUSA:                 Yes or no?

FOSTER:               — I plead the Fifth.

AUSA:                 You take the Fifth on that, on that question, too?

FOSTER:               It's a clever way around me not answering the question.

AUSA:                 It is a clever way.  So one question you won't answer is whether you're distributing, the second one is you won't answer why you won't answer the question; right?  Twice?

6

FOSTER:         That's correct.

AUSA:           Okay.  So you take the Fifth twice?

FOSTER:         That's correct.

Foster never testified that he traded meth for sex.

During her closing argument, the AUSA emphasized Foster's "many lies." She argued:  "[W]hen he wasn't lying and backtracking on what he said on the scene, he was trying to take the Fifth Amendment.  So I submit to you that he was lying."  Later, during her rebuttal argument, the AUSA commented again — and this time extensively — on Foster's invocation of his right to remain silent:

> Now, this is not the defendant's first rodeo.  Okay.  He's been in trouble before.  And he came in here today and he tried to take the Fifth about some things.  Now, if the Fifth was really a viable option and . . . taking the Fifth was really something he wanted to do, why didn't he take it on the scene that night?  Because if he had taken it on the scene — his motive for taking it today was to protect himself and his friend. (Indicating.)  Well, if he had taken the Fifth on the scene, he wouldn't have been telling on himself and he wouldn't have been telling on his friend.[3]

> So to come in here now and say he's taking the Fifth, again, that's just something that just belies logic.  Because if his whole motivation was to protect his friend, he would have just taken the Fifth on the scene.

---

[3] On the scene, Foster told Deputy Cassady that the meth labs found in his bedroom belonged to him.  On the stand, he changed his story and testified that the labs actually belonged to the other person living in the house at the time, his friend Mark Bush.  When pressed to explain the inconsistent statements, he stated that he claimed possession on the scene out of a desire to protect his friend.

7

The AUSA also argued that Foster's intent to possess the firearms was shown by evidence that he was distributing meth from his friend's house. In summarizing that evidence, she stated:

> Do you remember when [Foster] testified he said: "I traded meth for sex with a white female"? And the only reason I'm saying "white female" is because that's the way the defendant described it.

At no time during the AUSA's closing arguments did defense counsel object.

## II.

"An appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (quotation marks omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (quotation marks omitted).

In Johnson v. United States, the Supreme Court held that where the Fifth Amendment privilege against self-incrimination is asserted on a matter by a testifying defendant and "unqualifiedly granted" by the court, it is error for the court to allow the prosecutor to comment on the defendant's refusal to testify on that matter. 318 U.S. 189, 196, 63 S. Ct. 549, 553 (1943). The Court explained:

> If the privilege claimed by the witness be allowed, the matter is at an end. The claim of privilege and its allowance is properly no part of

8

the evidence submitted to the jury, and no inferences whatever can be legitimately drawn by them from the legal assertion by the witness of his constitutional right. The allowance of the privilege would be a mockery of justice, if either party is to be affected injuriously by it. . . . [I]f [the privilege] is claimed and granted outright, [the accused] has every right to expect that the ruling is made in good faith and that the rule against comment will be observed.

Id. at 196–97, 63 S. Ct. at 553 (quotation marks and citations omitted).

The government does not challenge the district court's ruling that Foster could invoke, and did properly and validly invoke, his right to remain silent on the issue of whether he was distributing meth. So we will take it as given, for purposes of this appeal only, that he did. Once the privilege was asserted by Foster and "unqualifiedly granted" by the court, the AUSA should not have commented on it. That is the plain holding of the Supreme Court's Johnson decision. See id. at 196, 63 S. Ct. at 553. And as our predecessor court explained:

[T]o meet the requirements of a fair trial as embodied in the Fifth Amendment, the trial judge must protect an accused's right of silence. The trial judge's approval of an improper comment or refusal to disapprove the comment and do whatever is necessary to protect a defendant from being penalized by relying on his constitutional right amounts, in our opinion, to sufficient participation in the comment or sanction of the comment so that it may be properly characterized as a violation of the Fifth Amendment.

9

De Luna v. United States, 308 F.2d 140, 154 (5th Cir. 1962)[4]; see also McGahee v.

Massey, 667 F.2d 1357, 1362 (11th Cir. 1982) ("The [F]ifth [A]mendment stands

as a sentinel for the protection of a defendant's constitutional right to remain silent.

Concomitant with that right is the prohibition of prosecutorial comment on its

exercise."). The AUSA, by her improper questions and comments, "manifestly

intended to urge the jury to draw an inference from [Foster's] silence that he [was]

guilty." United States v. Thompson, 422 F.3d 1285, 1299 (11th Cir. 2005). We

conclude that her conduct plainly violated Foster's Fifth Amendment right to

remain silent and it was plain error for the court to permit it.

Unfortunately, there was more. During closing argument the AUSA

remarked that Foster, who is black, had testified that he "'traded meth for sex with

a white female.'" That statement is egregiously improper for three reasons. First,

it falsely attributes to Foster testimony he did not give. See Davis v. Zant, 36 F.3d

1538, 1548 (11th Cir. 1994) ("Little time and no discussion is necessary to

conclude that it is improper for a prosecutor to use misstatements and

falsehoods."). Second, even if we assume that the AUSA confused Foster's

testimony with Deputy Cassady's testimony about what Foster had told him, it

misrepresents even that. Cassady testified that Foster told him that he shared one

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

10

batch of meth with a white female named Sadie, but not that he had traded it to her for sex. Cassady further testified that Foster "later told me that he cooked some meth because he trades it for sexual favors," but he did not say that those with whom Foster had traded it were white females. See Brooks v. Kemp, 762 F.2d 1383, 1413 (11th Cir. 1985) (en banc) ("Even if brief, use of race as a factor in closing argument obviously would be improper and would have great potential for prejudice.") (citation omitted), vacated on other grounds, 478 U.S. 1016, 106 S. Ct. 3325 (1986); United States v. Rodriguez, 765 F.2d 1546, 1560 (11th Cir. 1985) ("A prosecutor is forbidden to make improper suggestions, insinuations and assertions calculated to mislead the jury and may not appeal to the jury's passion or prejudice.") (quotation marks and alteration omitted). Third, the AUSA's statement violated the court's earlier ruling — surely not forgotten over the lunch break — that evidence Foster had traded meth for sex was irrelevant and inadmissible. In short, the AUSA's argument misrepresented testimony, violated a clear ruling of the court, and injected race and sex into a case that had nothing to do with either.

The question is whether the combination of these errors and misconduct warrant the reversal of Foster's conviction under the plain error rule. Based on the unique circumstances and facts of this case, we conclude that it does. There is no doubt that there were errors and that they were plain as could be. We also

conclude that the errors affected Foster's substantial rights because the entire case turned on his credibility. It all boiled down to the simple, solitary question of whether the jury believed Foster's testimony that he did not intend to possess the firearms that were found in close proximity to him in his friend's house. He testified he did not; the government argued he did. This brief trial was rife with prosecutorial misconduct that was designed to, and likely did, destroy Foster's credibility.

That leaves us with the fourth requirement of the plain error test, which is that the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Rodriguez, 398 F.3d at 1298. The meaning of those words is not always clear, but they clearly fit here. It is unfair, undermines the integrity of the trial process, and affects the public reputation of judicial proceedings to allow a prosecutor in cross-examination and closing argument to assail a defendant for invoking his constitutional rights, argue that it is proof of guilt, misrepresent testimony to the jury, and inject race and sex into a case where neither belonged. We do not decide whether we would reach the same result based on one of the errors alone, or any combination less than all of them, because we do not have to.[5]

---

[5] Out of a desire to be fair to AUSA Vann, we asked her to attend oral argument in this case. After hearing argument on the merits by the Public Defender and another AUSA, we gave Ms. Vann the opportunity to explain her conduct. Suffice it to say, the proffered explanation was unconvincing.

12

We **REVERSE** Foster's conviction, **VACATE** his sentence, and **REMAND**
the case for a new trial.