Filed 6/30/15  P. v. Schumann CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B252493 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA396197) |
| v. | |
| JASON SCHUMANN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael V. Jesic, Judge.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, Steven E. Mercer and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Jason Schumann appeals from the judgment entered following a jury trial in which he was convicted of first degree murder with firearm findings. Defendant contends the exclusion of hearsay evidence tending to implicate his girlfriend as the killer violated due process, the prosecutor committed misconduct, the evidence was insufficient, evidence that defendant was engaged in identity fraud was improperly admitted, and the cumulative effect of the various claimed errors requires reversal. We affirm.

## BACKGROUND

### 1.    Defendant's relationship with Elizabeth Ibarra

Defendant and his girlfriend Elizabeth Ibarra had a tumultuous relationship that was marked by copious use of methamphetamine, jealousy, constant arguing, and periods of incarceration for each of them. Defendant physically and verbally abused Ibarra and took control of her life and her property. When Ibarra became pregnant, the relationship worsened.

Around the end of 2010 or early 2011, Ibarra learned defendant had cheated on her and fathered another child. She was angry and hurt and later decided to seek revenge by exchanging sexually explicit text messages with high school student Francisco Rodriguez, whom she had met through her cousin in the summer of 2011 while defendant was in custody. Because defendant exercised control over Ibarra's mobile phone, Ibarra knew defendant would see the texts. Rodriguez agreed to participate in the plan. In reality, Ibarra and Rodriguez were just friends. When defendant saw the messages, he broke through the bathroom door to confront Ibarra. She explained that it was a setup to make him jealous, but defendant continued to raise the issue from time to time, such as when Ibarra brought up the mother of defendant's new baby. Defendant asked Ibarra's cousin about the relationship between Rodriguez and Ibarra, and Ibarra's cousin told defendant the two were just friends and that Rodriguez was just a young boy. Defendant told Ibarra's cousin he wanted to harm Rodriguez.

**2.      The murder**

On January 11, 2012, defendant and Ibarra smoked methamphetamine, as they did every day, and fought throughout the day about defendant's infidelity and his belief Ibarra had also been unfaithful with Rodriguez. While they were in the parking lot of a Target store, defendant kicked a soda onto Ibarra because she would not get into the car. After she got in, he broke the driver's side window with his elbow. Defendant then drove to Rodriguez's neighborhood, and Ibarra pointed out the house where Rodriguez lived. Defendant insisted Ibarra bring Rodriguez outside to confirm there had been no affair between Rodriguez and Ibarra. After arguing with defendant for a time, Ibarra went to the house and knocked on the door.

Rodriguez answered the door. Ibarra told him defendant was "'tripping about the text'" and wanted to hear from Rodriguez that he and Ibarra were merely friends. Rodriguez agreed to go outside. His older sister saw Ibarra at the door and recognized her as someone she had seen talking to her brother the prior summer.

Ibarra walked back to her car and confirmed that Rodriguez was coming out. Defendant got out of the car when Rodriguez came out of the house and the three of them stood on the front lawn. Rodriguez told defendant that he had not been sexually involved with Ibarra. Defendant laughed. Ibarra was angry and embarrassed. She swore at defendant and called him stupid. Rodriguez tried to calm Ibarra and urged her not to be angry at defendant. Defendant repeatedly directed Rodriguez to get in Ibarra's car, but Rodriguez refused. Ibarra "went off" on defendant, asking him why Rodriguez should get in the car and whether defendant wanted Rodriguez to write an essay.

Defendant pulled a gun from his waistband and shot Rodriguez three or four times. By the second shot, Ibarra was walking back to her car. Rodriguez's sister ran out the front door of the family home and saw Ibarra getting in the passenger's side of a dark green Ford Explorer she recalled seeing previously. Rodriguez's sister did not see defendant. Defendant had difficulty finding the keys and starting the car. When he got it started, he sped away.

3

Rodriguez, who was 17 years old, died from blood loss caused by four gunshot wounds, three of which were to his chest and one to his lower back. Two of the wounds could have been caused by a single shot.

Defendant had previously told a friend of Ibarra's sister that he always carried a gun. Ibarra testified defendant had modified the console in her Ford Explorer to create an easily accessible hiding space for his gun. In late 2011 he obtained a new .40-caliber semiautomatic handgun that he hid in the attic of their room or carried in the hiding space in the console of Ibarra's Explorer. On December 28, 2011, he had Ibarra place an online order for two magazines for the gun using Mary Platt's credit card, which some man gave to defendant.[1] The magazines were out-of-stock and were not delivered until a few days after Rodriguez's murder.

Ibarra testified defendant seemed "giddy," "cocky," and "excited" after checking news reports regarding the shooting because the only suspect mentioned was a red-haired woman. Defendant told Ibarra to dye her hair, and a few days later he dyed it for her. He said he wanted to trade the gun he had used to kill Rodriguez for another of the same caliber so that the magazines he had ordered would fit. He also talked about creating an alibi and told her that if the police questioned her she should ask for an attorney and not talk about the shooting.

3.	**Investigation**

Police searched the home of defendant's parents, where defendant and Ibarra had been living. They found .40-caliber ammunition in a locked box in defendant's parents' bedroom and in a gun safe in the basement, magazines and a speed loader. They found a single .40-caliber cartridge inside a sock in a drawer full of lingerie in the bedroom defendant and Ibarra stayed in. The key to the locked ammunition box was found on a key ring in the bedroom used by defendant and Ibarra. They also found a large quantity

---

[1] Outside the presence of the jury, the prosecutor admitted the man was Mary Platt's son, Gary.

4

of "profiling information," including names, addresses, phone numbers, and social security numbers, along with blank credit cards and blank check forms for computer printing. Some of this material was in the locked ammunition box found in the parents' bedroom. Ibarra testified at trial that she and defendant were unemployed and stole wallets, checks, and credit cards, sometimes by breaking into cars, to pay for what they needed.[2] Ibarra had several convictions for fraud and forgery.

Police recovered four casings at the crime scene and located a bullet lodged in the Rodriguez family home. Ballistics testing revealed that all four casings, the bullet lodged in the house, and a bullet recovered by the coroner were fired from the same .40-caliber gun. Broken glass found at the crime scene was indistinguishable from glass fragments found inside the driver's door of Ibarra's Explorer. Defendant could not be excluded as a contributor to the DNA profile developed from a cigarette butt found at the scene.

### 4. Statements of defendant and Ibarra

Defendant and Ibarra were arrested about five days after the shooting. Detectives interviewed each of them at length. Ibarra lied to the detectives and told them at least three different stories—including one blaming "Frank" or "Shadow" for the shooting—before she identified defendant as the shooter. Interviewing Detective Pam Pitcher testified that although Ibarra struggled to shield defendant, she never suggested or admitted that she herself shot Rodriguez.

Pitcher testified that defendant told at least six different stories, including several blaming "Pelon" for the shooting. Eventually defendant admitted that he shot Rodriguez two to four times. He explained Ibarra's attitude and tone were making him angry and things got out of control. He said he had thrown away the gun in the trash at his parent's home, but Ibarra did not see him do so and did not know what he had done with the gun.

---

[2] The trial court admitted, but later struck, evidence regarding a window punch device located on the key ring that the police found in defendant's bedroom. Ibarra also testified defendant used that device to break into cars.

Pitcher testified that defendant did not even come close to saying Ibarra was the shooter and Pitcher did not believe he took the blame to protect Ibarra.

Conversations between Ibarra and defendant while they were transported to court and placed in adjacent holding cells on February 1, 2012, were surreptitiously recorded and segments were played at trial. In several conversations, defendant warned Ibarra to be careful about what she said because their conversation might be recorded and used to build the case against him. On one occasion, he added that his lawyer said they had to keep quiet.

Defendant said he had seen "in the papers" that Ibarra had "ratted" on him. After she said she only told police the truth about their relationship and that defendant was "a natural asshole" and bipolar, he said, "[R]emember what I told you when you talk to people? What you tell them?" Defendant confronted Ibarra with things the detectives said Ibarra had told them, for example that he had "pulled the trigger." Defendant said, "I told them five different stories. Like, I told you, you do?" Later he said, "[T]hey don't have a story with me because I told them five different things." He continued, "Hey, I had a crazy ass story. You know how my imagination works, right?" He added, "I turned it into a 5 hour story."

Defendant asked Ibarra if she remembered what he told her about what happened if he held his breath. She responded that his eyes would get teary, then explained, "It was hard for me to cry. I was crying for my cigarettes." Defendant said, "I did it and I couldn't cry. My nose . . . started bleeding. . . . So they thought I was so frustrated and that I was breaking down. So they go, so you snapped. I guess, if that's what you wanna call it." Defendant said he told the detectives he cared only that Ibarra went "home with the kids. And if you want to lock me up, lock me up. And I'll say whatever you want me to say."

When Ibarra said the detectives had mentioned "the black case," defendant said he had hidden it in his mother's room, then laughed. Later when he asked her what was found in the house, Ibarra replied, "Just the black box." He asked, "They didn't find the

gun?" then, "Or they did?" Ibarra said she did not know, but did not think so. Later, he proclaimed, singing, "They haven't found it!"

Defendant also said, "I know where our alibi is, too, if we can't get one." Ibarra later chided him for just thinking about how to "get out of here," and urged him to "think about where you went wrong and . . . think from your heart." A little later she said he had gone "overboard" and taken "something to an extreme because of . . . selfishness." He replied, "Because of someone who I love so much, how they treated me." Ibarra later said if defendant had "heard everything I had to say about you, you would never have done what you did. You would have never thought what you thought." Defendant responded, "Hey, you know what, if you wouldn't have—if you didn't react the way you reacted and start shit how you start—" Ibarra said, "I did it because that's what females do." Defendant replied, "Then this is what I do," and told her to stop blaming him.

Defendant and Ibarra also communicated in writing while they were in custody and some of their communications were read into evidence at trial. One note from defendant told Ibarra not to testify against him.

5.     **Verdicts and sentencing**

The jury convicted defendant of first degree murder and found true allegations defendant had personally used a firearm (Pen. Code, § 12022.5, subd. (b)) and personally fired a firearm, causing death (§ 12022.53, subd. (d)).[3] The court sentenced defendant to prison for 50 years to life.

**DISCUSSION**

1.     **Exclusion of Nakamura's letter**

Defendant contends the trial court violated his right to due process by precluding him from introducing admissions purportedly made by Ibarra to a fellow inmate who refused to testify.

---

[3] Undesignated statutory references are to the Penal Code.

7

### a. Proceedings in the trial court

Alternate Public Defender Ken Nakamura contacted the prosecutor in defendant's case, Beth Silverman, regarding information he had received from one of his clients, Maria Peleaz, about purported admissions by Ibarra. Silverman asked Nakamura to provide the information in writing. Nakamura sent Silverman a letter dated July 17, 2012, which stated Ibarra and Peleaz were housed together in jail and "Ibarra somehow trusted [Peleaz] and was fairly loose with her conversation. [¶] While watching the news sometime in January, a story came up about some robberies in Northridge (?). Ms. Ibarra freaked for a moment, thinking they were talking about her. 'They also have that against us?' She then laughed when she realized it was someone else."

The letter continued, "One day after a court date, Ms. Ibarra said was [*sic*] scared that the detectives would find the gun, because it might have fingerprints of her children because they would sometimes play with it. She asked [Peleaz] what was being said on the TV news. [Peleaz] told her the detectives were looking for the gun in Agoura Hills. Ms. Ibarra laughed and said she and her man were giving the cops BS to have them go in circles. The gun was really disposed of in Zuma Beach. [¶] On February 12, Ms. Ibarra told [Peleaz] she was the one who shot the victim, Francisco. There were 4 shots fired. One was to the head, one to the chest, one to the side, and one missed. She had 'put in some work.' When asked for whom, she said for herself. [¶] The gist of the conversations is that Jason Shuman [*sic*] is taking the heat for the murder. The plan is for her to get out so she can take care of him and the children. She hoped that they wouldn't give Jason a lie-detector test, because they would know he is lying."

Nakamura testified outside the presence of the jury that Peleaz provided the information because she was interested in resolving her own pending criminal case and

thought she might trade the information for favorable treatment.[4]  In the end, she received no consideration for the information.

Silverman informed the court that she had a witness who was also housed with Ibarra and Peleaz who would testify that Ibarra did not say she shot the victim, but instead said defendant had shot him.

Outside the presence of the jury, Peleaz refused to be sworn or answer any questions.  Defendant sought to introduce Peleaz's statements through Nakamura's testimony or letter to impeach Ibarra's testimony that defendant shot Rodriguez and her denials that she was the shooter.  Defense counsel recognized the evidentiary hurdles to admission of Peleaz's statements, but argued their exclusion would violate due process. The trial court ruled that defense counsel could ask Ibarra if she ever made statements where she admitted to shooting the victim, but could not introduce Peleaz's out-of-court statements if Peleaz did not testify.

In the presence of the jury, Ibarra testified that although she was not charged with killing Rodriguez, she was found in violation of her probation and spent a year in custody for that violation.  While in custody, she met an inmate named Maria Peleaz.  Peleaz asked Ibarra about the murder, but Ibarra did not trust her and spoke only of her feelings, not any facts relating to the murder.  Ibarra denied she told Peleaz that she shot Rodriguez, that defendant had agreed to take responsibility for the murder, that they discarded the murder weapon at Zuma Beach, and that there were four shots fired:  one to the head, one to the chest, one to the side, and one that missed.  She further denied telling Peleaz that she feared the police's finding the gun because it might have her children's' fingerprints on it, and that she had "freaked out" upon hearing a news report about robberies in Northridge and said, "'They also have that against us.'"  Ibarra further denied

---

[4]  Peleaz actually reached a plea agreement about five weeks before the date of Nakamura's letter, but Nakamura recalled sending the letter before that agreement was reached and suggested the letter reflected the wrong date.

that she asked Peleaz what was being said on television news about the murder, that Peleaz said the police were searching for the gun in Agoura Hills, and that Ibarra said she and defendant were "giving the cops BS to have them go in circles." Ibarra also denied telling Peleaz she had put in some work.

Ibarra also testified that Peleaz was one of several inmates to whom she and defendant had transmitted written correspondence within the jail system because Ibarra and defendant were not allowed to communicate with one another. Ibarra wrote to defendant under Peleaz's name and booking number.

### b. Relevant principles of law

We review any ruling on the admissibility of evidence for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 577.)

An out-of-court statement that is offered to prove the truth of the matter stated therein constitutes hearsay and is inadmissible absent an applicable exception. (Evid. Code, § 1200.) Where a statement involves multiple levels of hearsay, each level must satisfy a hearsay exception in order for the entire statement to be admissible. (Evid. Code, § 1201; *People v. Reed* (1996) 13 Cal.4th 217, 224–225.)

"[F]oundational prerequisites are fundamental to any exception to the hearsay rule. (*Chambers v. Mississippi* [(1973)] 410 U.S. [284,] 302; *California v. Green* (1970) 399 U.S. 149, 154; cf. *Washington v. Texas* (1967) 388 U.S. 14, 23, fn. 21 [state may provide for testimonial privileges and nonarbitrary rules disqualifying certain witnesses].) As a general proposition, criminal defendants are not entitled to any deference in the application of these constraints but, like the prosecution, 'must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' (*Chambers v. Mississippi*, *supra,* 410 U.S. at p. 302.)" (*People v. Hawthorne* (1992) 4 Cal.4th 43, 57 (*Hawthorne*).)

"A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. [Citations.] A defendant's interest in presenting such evidence may thus "'bow to accommodate other legitimate interests in the criminal trial

10

process.'" [Citations.] As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' [Citations.] Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." (*United States v. Scheffer* (1998) 523 U.S. 303, 308, fn. omitted [118 S.Ct. 1261] (*Scheffer*).) "State and Federal Governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial. Indeed, the exclusion of unreliable evidence is a principal objective of many evidentiary rules." (*Id.* at p. 309.)

"'Few rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.] [But i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' (*Chambers v. Mississippi*, *supra*, 410 U.S. 284, 302 [93 S.Ct. 1038, 1049].) Thus, '[a] defendant does not have a constitutional right to the admission of unreliable hearsay statements.' [Citations.]" (*People v. Ayala* (2000) 23 Cal.4th 225, 269 (*Ayala*).)

**c.     The trial court neither abused its discretion nor violated due process by excluding the evidence**

Three levels of hearsay were encompassed in each of the purported statements by Ibarra contained in Nakamura's letter: Ibarra's statement to Peleaz, Peleaz's statement to Nakamura, and Nakamura's written repetition of those statements in the letter.[5] Each level had to fall within the scope of an exception to the hearsay rule to make the evidence

---

[5] Defendant frames his issue in terms of exclusion of the letter. Had the court permitted Nakamura to testify to the statements by Peleaz, there would have been only two levels of hearsay, but that would not have eliminated the hearsay problem.

11

defendant wanted to introduce admissible. (Evid. Code, § 1201.) Ibarra's purported statements to Peleaz probably fell within the exception for declarations against penal interest (Evid. Code, § 1230), but no exception applied to Peleaz's statements to Nakamura, as defendant implicitly recognizes on appeal. The trial court and parties considered the applicability of the prior inconsistent statement exception (Evid. Code, § 1235), but because Peleaz refused to testify, the exception was inapplicable, i.e., there was no testimony inconsistent with prior statements by Peleaz. (*People v. Rios* (1985) 163 Cal.App.3d 852, 864.) Although the purported statements by Ibarra contained in Nakamura's letter were inconsistent with Ibarra's testimony at trial and would therefore fall within the exception for prior inconsistent statements, defendant was nonetheless unable to prove such inconsistent statements with admissible evidence because, unless Peleaz testified to such statements, his only proof consisted of inadmissible hearsay statements by Peleaz to Nakamura.

On appeal, defendant argues, in essence, that due process required the trial court to allow him to introduce Peleaz's hearsay statements to prove prior inconsistent statements by Ibarra. He principally relies upon *Chambers v. Mississippi*, *supra*, 410 U.S. 284, at page 302 (*Chambers*), arguing "that the 'hearsay rule may not be applied mechanistically to defeat the ends of justice.'" Defendant reads *Chambers* too broadly. As the United States Supreme Court has explained, "*Chambers* was an exercise in highly case-specific error correction. At issue were two rulings by the state trial court at Chambers' murder trial: denial of Chambers' motion to treat as an adverse witness one McDonald, who had confessed to the murder for which Chambers was on trial, but later retracted the confession; and exclusion, on hearsay grounds, of testimony of three witnesses who would testify that McDonald had confessed to them. We held that both of these rulings were erroneous, the former because McDonald's testimony simply *was* adverse, *id.*, at 297–298, and the second because the statements 'were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability,' *id.*, at 300, and were 'well within the basic rationale of the exception for

12

declarations against interest,' *id.*, at 302. Thus, the holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." (*Montana v. Egelhoff* (1996) 518 U.S. 37, 52–53 [116 S.Ct, 2013.)

Indeed, the court expressly explained in *Chambers*, "In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." (*Chambers*, *supra*, 410 U.S. at pp. 302–303.) In *Scheffer*, *supra*, 523 U.S. at page 316, the court noted, "*Chambers* . . . does not stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence."

Similarly, the California Supreme Court has rejected the proposition that *Chambers* established a defendant's due process right to the admission of "exculpatory but unreliable hearsay evidence that is not admissible under any statutory exception to the hearsay rule." (*Ayala*, *supra*, 23 Cal.4th at pp. 266, 269–270 [hearsay statements of deceased persons to defense investigators]; see also *Hawthorne*, *supra*, 4 Cal.4th at pp. 55–59 [preliminary hearing testimony of trial witness regarding statements by police while showing witness photographic array].) In *Hawthorne*, the court noted that the foundational prerequisites of Evidence Code sections 1235 and 1291 (former testimony) are not arbitrary, "'archaic, irrational, and potentially destructive of the truth-gathering process,'" but instead "reasonably and rationally relate to the particular hearsay exception concerned." (4 Cal.4th at p. 57.) "In addition, trial courts do not 'mechanistically' apply these exceptions, but exercise broad discretion in determining compliance with

13

foundational requirements in light of countervailing constitutional considerations." (*Id.* at pp. 57–58.)

The trial court's exclusion of Peleaz's hearsay statements in this case was not a mechanistic, irrational, or arbitrary exclusion of reliable evidence. Peleaz was a jailhouse informant seeking to obtain favorable treatment in her own case in exchange for purported admissions by Ibarra. This circumstance alone shrouded Peleaz's statements in an aura of untrustworthiness. (See, e.g., section 1127a [mandating jury instruction where in-custody informant testifies].) Moreover, the content of her statements, as set forth in Nakamura's letter, exposed additional grounds for distrust. She claimed Ibarra said Rodriguez was shot once in the head, once in the chest, and once in the side, whereas the deputy medical examiner testified Rodriguez had four gunshot wounds: three to his chest and one to his lower back. The prosecutor also had a witness who was in custody with Peleaz and Ibarra and would have refuted Peleaz's claim that Ibarra admitted she shot Rodriguez. The inherent untrustworthiness of Peleaz's statements necessitated either cross-examination, which was made impossible because Peleaz refused to testify, or exclusion in conformity with "'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" (*Ayala*, *supra*, 23 Cal.4th at p. 269, quoting *Chambers*, *supra*, 410 U.S. at p. 302.) In sum, the nature of the excluded evidence in this case and the sound, well-established principles precluding its admission distinguish it from *Chambers*. The trial court did not err, either by abuse of discretion or violation of due process, by excluding Peleaz's hearsay statements.

## 2. Prosecutorial misconduct

Defendant contends that the prosecutor committed misconduct during her questioning of Ibarra and her rebuttal argument in relation to Peleaz's statements.

### a. Proceedings in the trial court

As previously set forth, defense counsel cross-examined Ibarra about every matter in Nakamura's letter, asking whether Ibarra had told Peleaz the particular matters set forth

14

in the letter. He asked, for example, "Did you ever tell Maria Peleaz that you were the shooter?" Ibarra denied making each such statement, but when defense counsel asked whether she was sure she had not told Peleaz she was the shooter, Ibarra responded, "That I'm aware of, yes, I'm sure." Defense counsel then examined Ibarra at length about why she chose to phrase her answer that way.

On redirect, the prosecutor asked Ibarra whether she had ever told Peleaz "that you were the shooter?" Ibarra said she had not. The prosecutor then asked, "Have you been shown any transcripts that show that you said that?" Ibarra said she had not.

Outside the presence of the jury, defense counsel argued that the prosecutor had opened the door to admitting Nakamura's letter when she asked Ibarra if she had seen "transcripts" reflecting her admission. The prosecutor explained that she used the word "transcripts" because it appeared that defense counsel was reading from a transcript, and she did not want the jury to think she had "stipulated that [Ibarra] made that statement." The parties had already stipulated, with reference to transcripts of grand jury proceedings and police statements, that transcripts accurately reflected the questions asked and answers given. Defense counsel stated that the prosecutor's question could lead the jury to believe that defense counsel fabricated Peleaz's statements. The trial court agreed, but declined to admit the letter. The court permitted defense counsel "to clarify that there's something other than a transcript that's in existence."

Accordingly, on recross-examination, defense counsel asked, "Now the prosecutor asked you if you had ever seen any transcript where Maria Peleaz indicated that you said you were the shooter, right?" After Ibarra asked what the question was, defense counsel asked, "Have you ever seen any transcript, a transcript, a question and answer situation where Maria Peleaz said that you were the shooter?" Ibarra said she had seen "a statement" from Peleaz "[a]t the grand jury." Defense counsel asked what the statement said, but the court sustained the prosecutor's hearsay objection.

During closing statements, defense counsel argued that Ibarra was the real shooter and that appellant was taking the blame for the murder so Ibarra could be free and take

15

care of their son. At one point, defense counsel stated, "That's why I asked Elizabeth Ibarra, 'Did you ever tell anybody? Did you ever tell Maria Peleaz—'" The trial court sustained the prosecutor's objection. Outside the presence of the jury, the trial court stated that the prior ruling was that defense counsel was not to bring up the letter, but noted defense counsel could comment on Ibarra's testimony and phrasing. The court then warned, "Don't mention Ms. Peleaz in closing. That was my ruling yesterday, not to mention Ms. Peleaz and not to get into her statement because we never had that as evidence in the case."

In rebuttal, the prosecutor argued, inter alia, as follows: "Now, just to summarize, so the defense argument is that Elizabeth Ibarra is the shooter. She's the real killer in this case. And you have the wrong person in front of you at trial. [¶] We have no evidence that that's what happened. She's denied it. The defendant's never even hinted at that being the truth. She has no motive to do so. The defendant does. She doesn't have a weapon. There isn't anything that you've heard about that case that Elizabeth Ibarra ever owned a weapon. And then, of course, she doesn't make any admissions to doing anything at that courtroom scene during the recordings in the courthouse lockup or during the sheriff's transport. In fact, her statements are all to the contrary. That means that to believe this defense you have to engage in speculation because in this case there is no evidence to suggest that the defendant and Ms. Ibarra had some type of agreement that he was going to take the fall for her. Because, of course, it comes back to the same ridiculous argument that somehow Elizabeth Ibarra shot her friend for no reason."

Defense counsel did not object to the prosecutor's argument.

### b.      Relevant principles of law

Conduct by a prosecutor can so infect the trial with unfairness as to make the resulting conviction a denial of due process. (*People v. Harrison* (2005) 35 Cal.4th 208, 242.) Conduct by a prosecutor that does not render a trial fundamentally unfair may nonetheless constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to attempt to persuade the court or jury. (*Ibid.*)

16

Eliciting evidence is not misconduct unless a prosecutor intentionally elicits inadmissible testimony.  (*People v. Scott*  (1997) 15 Cal.4th 1188, 1218.)  "It is misconduct for a prosecutor to ask a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means."  (*People v. Price*  (1991) 1 Cal.4th 324, 481.)

If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider whether, considering the challenged statements in the context of the argument as a whole, there is a reasonable likelihood that the jury construed or applied any of the challenged statements in an objectionable fashion.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1202–1203 (*Cole*).)  No misconduct exists if a juror would have taken the statement to state or imply nothing harmful.  (*People v. Benson* (1990) 52 Cal.3d 754, 793.)  "'[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'  [Citation.]"  (*People v. Dykes* (2009) 46 Cal.4th 731, 772.)

A prosecutor has wide latitude to discuss, argue reasonable inferences from, and comment upon the evidence.  (*Cole*, *supra*, 33 Cal.4th at p. 1203.)  Mischaracterizing the evidence, however, is misconduct.  (*People v. Hill* (1998) 17 Cal.4th 800, 823.)  In addition, "[t]he prosecutor's argument cannot refer to the absence of evidence that only the defendant's testimony could provide," but fair comment "on the failure of the defense to introduce material evidence or to call logical witnesses" is permitted.  (*People v. Brady* (2010) 50 Cal.4th 547, 565–566.)  The prosecutor may not seek to mislead the jury by arguing "the 'lack' of evidence where the defense was ready and willing to produce it," and would have done so but for an erroneous evidentiary ruling.  (*People v. Varona* (1983) 143 Cal.App.3d 566, 570 (*Varona*); *People v. Daggett* (1990) 225 Cal.App.3d 751, 758 [prosecutor "unfairly took advantage" of an erroneous evidentiary ruling by arguing for "the jurors to draw an inference that they might not have drawn if they had heard the evidence the judge had excluded"]; *People v. Lawley* (2002) 27 Cal.4th 102,

156 (*Lawley*) [distinguishing *Varona* and *Daggett* because these cases "involved erroneous evidentiary rulings on which the prosecutor improperly capitalized during his closing argument"].)

To preserve a claim of prosecutorial misconduct for appeal, the defendant must make a timely objection at trial on the ground asserted on appeal and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm or objection would have been futile. (*People v. Thomas* (2012) 54 Cal.4th 908, 937.)

**c.      The prosecutor did not engage in misconduct by asking Ibarra about transcripts**

Defendant contends that by asking Ibarra whether she had seen any transcripts showing that she had admitted shooting Rodriguez the prosecutor "improperly implied during examination of [Ibarra] that there was no evidence that [she] had confessed to Peleaz."

As far as the record reveals, the prosecutor's question was a proper response to defense counsel's conduct during cross-examination, in which he appeared to look at a document while asking Ibarra whether she had made specific statements to Peleaz. Many of defense counsel's questions included a date, e.g., "On February 12th, 2012, did you tell Ms. Peleaz that you were the one who shot the victim, Francisco?" Defense counsel did this after cross-examining Ibarra at length about her prior testimony to the grand jury, statements to police, and surreptitiously recorded conversations with defendant, during which counsel frequently referred to and read from transcripts. In addition, as the prosecutor explained, counsel had stipulated in the presence of the jury that the transcripts they were using were accurate with respect to the questions asked and answers given. The jury could thus reasonably have believed that defense counsel was looking at a transcript of Ibarra's statements to Peleaz—perhaps a transcript of a surreptitiously recorded jail conversation—while he questioned her regarding those statements. The jury could even have believed that counsels' stipulation applied to such a transcript. The

18

prosecutor's question honed in on that potential misunderstanding by referring only to transcripts, not any other type of document.

In any event, to the extent the prosecutor's question caused any juror to believe defense counsel had made up Peleaz's statements, such belief was necessarily dispelled by Ibarra's responses to defense counsel's questioning on recross-examination regarding the "statement" from Peleaz Ibarra had seen "[a]t the grand jury."

Accordingly, we conclude the prosecutor's question was not misconduct and no confusion or prejudice resulted from it. Moreover, defendant forfeited his prosecutorial misconduct claim by failing to timely object and request an admonition.

### d. The prosecutor did not engage in misconduct in argument

Relying upon *Varona*, *supra*, 143 Cal.App.3d 566, and *Davis v. Zant* (11th Cir. 1994) 36 F.3d 1538 (*Davis*), defendant argues the prosecutor committed misconduct by "falsely asserting in closing argument that there was 'no evidence' that [Ibarra] had ever confessed to the murder."

We first note defendant misconstrues the prosecutor's argument, which was that the jury had no evidence that Ibarra shot Rodriguez, not that there was no evidence she had confessed to murdering him.

More significantly, defendant's contention misconstrues the applicable law. *Varona*, *supra*, 143 Cal.App.3d 566, applies only where a prosecutor capitalizes on his or her erroneous exclusion of evidence and argues a falsehood. Here, the exclusion of Peleaz's hearsay statements was proper. Moreover, the prosecutor had a witness who would have contradicted Peleaz, had both testified. Thus, the prosecutor did not argue something she knew to be false. As stated in *Lawley*, *supra*, 27 Cal.4th at page 156, "[T]he prosecutor's argument constituted fair comment on the evidence, following evidentiary rulings we have upheld, there was no misconduct and, contrary to defendant's claim, no miscarriage of justice."

19

We need not address *Davis*, *supra*, 36 F.3d 1538, upon which defendant also relies because we are not required to follow federal lower court precedents, even on federal questions.  (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3.)

Moreover, defendant forfeited his prosecutorial misconduct claim by failing to timely object and request an admonition.

**3.      Sufficiency of evidence of premeditation**

Defendant contends there was insufficient evidence of premeditation to support his first degree murder conviction.  He argues there was no evidence of planning or a manner of killing indicative of premeditation.

**a.      Relevant principles of law**

To resolve a sufficiency of evidence issue, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt.  (*People v. Tully* (2012) 54 Cal.4th 952, 1006.)  Substantial evidence is "'"'evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"'"  (*Ibid*.)  We presume the existence of every fact supporting the judgment that the jury could reasonably have deduced from the evidence and make all reasonable inferences that support the judgment.  (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Catlin* (2001) 26 Cal.4th 81, 139.)

Premeditation requires that the act be considered beforehand.  Deliberation requires careful thought and weighing of considerations for and against the act.  (*People v. Mayfield* (1997) 14 Cal.4th 668, 767, abrogated on a different ground in *People v. Scott* (S064858, June 8, 2015) 2015 WL 3541280.)  These processes can occur very rapidly, even after an altercation is under way.  (*Mayfield*, at p. 767; *People v. Sanchez* (1995) 12 Cal.4th 1, 34, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the California Supreme Court described the three categories of evidence that typically support a finding of

20

premeditation and deliberation: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Anderson*, at pp. 26–27.) These categories are not prerequisites, however, but simply guidelines to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations, rather than an unconsidered or rash impulse. (*People v. Young* (2005) 34 Cal.4th 1149, 1183.)

### b. Sufficient evidence supported a finding of premeditation

Substantial evidence of premeditation supports defendant's conviction, including evidence in both the planning and motive categories described by *Anderson*, *supra*, 70 Cal.2d 15. Defendant was jealous of, and angry at, Rodriguez because defendant had seen the sexually explicit text messages Rodriguez had exchanged with Ibarra and believed Rodriguez and Ibarra had actually had an affair. This was amply demonstrated by Ibarra's testimony that defendant broke through a bathroom door when he discovered the messages, the testimony of Ibarra's cousin that defendant threatened to harm Rodriguez, and Ibarra's testimony that defendant frequently raised the topic of her

21

"affair" with Rodriguez and argued with her about Rodriguez, including on the day of the murder. Indeed, defendant's jealousy was demonstrated by his demand that Ibarra bring Rodriguez out of his home so defendant could hear from Rodriguez himself whether there had been an affair between Ibarra and Rodriguez.

With respect to planning activity, defendant drove with a loaded gun in the vehicle to Rodriguez's neighborhood to find him, which showed advance consideration of the possibility of murdering Rodriguez. (*People v. Miranda* (1987) 44 Cal.3d 57, 87 ["the fact that defendant brought his loaded gun into the store and shortly thereafter used it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance"], disapproved another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.) Upon arriving in the neighborhood, defendant directed Ibarra to go and get Rodriguez. The jury reasonably could conclude this reflected a plan by defendant to obtain access to Rodriguez and increase Rodriguez's vulnerability, in that Rodriguez was more likely to emerge from his house if requested to do so by his friend Ibarra than by Ibarra's jealous boyfriend. Defendant also directed Rodriguez to get into Ibarra's vehicle, suggesting defendant planned to further isolate Rodriguez and move him to a location where defendant could harm him with less risk that anyone would intervene to help Rodriguez or report the crime. In addition, some degree of planning may be inferred from defendant's online order of magazines for his .40-caliber gun two weeks before the murder. Had the magazines not been out of stock, defendant likely would have received them before the murder.

Defendant argues "the shooting was a classic example of a killing in the heat of passion," and cites excerpts of his conversations with Ibarra in which (1) she said he had "'snapped'" and he responded that he had snapped because she pushed him "'to that limit'" and (2) defendant recounted that a detective suggested defendant had "'snapped.'" These references to snapping fell far short of negating the substantial evidence of premeditation and did not require the jury to conclude that defendant acted from provocation or heat of passion. Moreover, Ibarra's testimony regarding defendant's

22

confrontation with Rodriguez showed it was not a heated confrontation. She testified defendant did not argue or fight, but merely laughed after Rodriguez told defendant he had not had an affair with Ibarra. Nor did Rodriguez behave in an angry or hostile manner toward defendant; indeed, he urged Ibarra to calm herself and not get angry at defendant. The jury was instructed upon voluntary manslaughter based on heat of passion, as well as first and second degree murder. It was also instructed that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." Yet the jury rejected the heat of passion theory and its verdict demonstrates it found defendant premeditated and deliberated before killing Rodriguez. Defendant's claim essentially asks this court to reweigh the evidence, which is improper.

Accordingly, we reject defendant's sufficiency of evidence contention.

**4. Admission of other crimes evidence**

Defendant contends the trial court erred by admitting evidence tending to show defendant was engaged in identity theft.

**a. Proceedings in the trial court**

Before trial began, the prosecutor informed the court she wanted to introduce evidence of the items found during the search of defendant's parents' home pertaining to identity theft, including stolen credit cards, personal identifying information from unknown persons, and fraudulent checks. She represented that it was relevant because Gary Platt provided defendant and Ibarra with his mother's credit card, which they used to purchase two magazines that would fit a gun that was never found, but the prosecution believed was used in the murder. Upon questioning by the court, the prosecutor clarified that the magazines were not used in the murder, but argued that ordering them showed access to a particular weapon.

Defense counsel agreed the evidence regarding the magazines was relevant, but objected to admission of evidence showing "a number of credit card thefts or frauds." The court deemed the evidence relevant to Ibarra's credibility, in that it would

23

corroborate her testimony that "this is how they lived their life, and this is how they were able to purchase these items." The court added, "Not only that, but those are the items that actually are used to purchase the magazines that are possibly used in the actual . . . murder." The prosecutor made no effort to correct the court's misunderstanding.

A detective subsequently testified that during execution of a search warrant at the home of defendant's parents, officers found a large quantity of "profiling information," including names, addresses, phone numbers, and social security numbers, along with blank credit cards and check forms for computer printing. They also found a window punch on the keychain in defendant's bedroom. In the midst of this testimony, the court explained, outside the presence of the jury, that it had admitted this evidence as "circumstantial evidence as to the defendant's ability—whether it's him or Ms. Ibarra, their ability to gain this type of information that was then used for the purchase of that ammo. It's circumstantial evidence that they're the ones who gained that information of Ms. Platt's to get that ammo. And that they're familiar with how to gain this information and how to use it in terms of having possession of other items, it's circumstantial evidence of their ability to be able to purchase an item with someone else's information. [¶] Furthermore, as to the key chain, my only reason for admitting the item on the key chain, which can be used to enter vehicles is, again, it's circumstantial evidence of this defendant or whoever's key chain that is, their ability to enter cars to gain that type of information, which is credit card information, debit card information. And it's for that sole purpose only."

Ibarra then testified that she and defendant were unemployed and stole wallets, checks, and credit cards, sometimes by breaking into cars using the window punch, to pay for what they needed. She also testified about obtaining Mary Platt's credit card and using it to order the magazines.

Thereafter, outside the presence of the jury, the court expressed concerns about the relevance of the identity theft and window punch evidence. The next day, the court again expressed concern about the evidence. The prosecutor represented that defense counsel

24

had said he had a strategic reason for "letting in a lot of this evidence . . . because he planned on using it to dirty up Ms. Ibarra because a lot of it points to her as much as it points to defendant." Defense counsel responded that he did not think he would be able to keep the evidence out and chose to focus on the murder charge, not to fight the small fights. He further believed a limiting instruction and argument would cure the problem. The trial court decided to strike the evidence regarding the window punch and it instructed the jury on that point.

The court further instructed the jury, as part of the charge, as follows: "In this case, you have heard evidence that the defendant Jason Schumann and Elizabeth Ibarra may have engaged in the crime of identity theft. That evidence was introduced for the limited purpose of showing circumstantial evidence as to how certain evidence was purchased in this case and you may only consider that evidence for that purpose. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

### b.      Relevant principles of law

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact of consequence to the determination of an action. (Evid. Code, § 210.)

Evidence of other offenses or misconduct is inadmissible to prove criminal propensity, but may be admitted to prove matters such as motive, intent, identity, or a common design or plan. (Evid. Code, § 1101, subds. (a), (b).) Evidence of other crimes should be received with extreme caution, and any doubts about its admissibility should be resolved in favor of the accused. (*People v. Guerrero* (1976) 16 Cal.3d 719, 724.)

"The inference of a criminal disposition may not be used to establish any link in the chain of logic connecting the uncharged offense with a material fact. If no theory of relevancy can be established without this pitfall, the evidence of the uncharged offense is simply inadmissible." (*People v. Thompson* (1980) 27 Cal.3d 303, 317.)

The admission of evidence may violate due process if there is no permissible inference a jury may draw from the evidence. (*People v. Steele* (2002) 27 Cal.4th 1230, 1246; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

**c.      The trial court should have excluded the other crimes evidence, but its admission was harmless**

The "profiling information," stolen and blank credit cards, and blank checks were irrelevant in this case. They did not give rise to any charge against defendant. They had nothing to do with the murder, or even the purchase of the magazines, which was accomplished with a credit card owned by Mary Platt and provided for defendant's use by her son Gary Platt. How defendant and Ibarra supported themselves was also irrelevant. The only relevance of this evidence was the impermissible propensity inference that defendant had a criminal disposition and was therefore more likely to have committed the charged murder. The trial court should have excluded all of this information as both irrelevant and inadmissible character evidence under Evidence Code section 1101, subdivision (a).

Nonetheless, we conclude that in light of the entire record, admission of this evidence was harmless beyond a reasonable doubt, given defendant's confession, Ibarra's testimony that defendant shot Rodriguez, defendant's statements to Ibarra reflecting his consciousness of guilt (e.g., attempting to fabricate an alibi, warning her not to say anything to the police, and warning her not to say things in custody that could be used to build a case against him), his statement to the police about disposing of the gun (also reflecting consciousness of guilt), the court's limiting instruction, and the relatively trivial, noninflammatory nature of identity fraud in comparison to the murder of a 17-year-old boy.

**5.     Cumulative error**

Defendant contends that the cumulative prejudicial effect of the various purported errors he has raised on appeal requires reversal of the judgment.  His cumulative error claim has no greater merit than his individual assertions of error, which we have rejected or found to be harmless.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


BENDIX, J.\*

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.